## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LUANN SUN                                          Case No.

     Plaintiff,

                              Hon.

v

VILLAGE OF DECATUR, a Michigan Municipal
Corporation and SAFEBUILT, INC., a Michigan
Corporation,

     Defendants.

---

ANDERSON J. GRANDSTAFF (P81331)
Attorney for Plaintiff
238 N. Summit St, Unit 1
Ypsilanti, MI 48197
(231) 838-7917
Anderson.j.grandstaff@gmail.com

---

### COMPLAINT FOR DECLARATORY RELIEF AND MONETARY DAMAGES

NOW COMES Plaintiff, Luann Sun ("Plaintiff"), by and through her attorney, Anderson Grandstaff, and for her Complaint against the Defendants, Village of Decatur, a Michigan Municipal Corporation (the "Village") and SAFEbuilt, Inc., a Michigan Corporation ("Safebuilt"), states as follows:

#### THE PARTIES

1.     Plaintiff is an individual residing in Kent County, Michigan.

2.     The Village of Decatur is a Michigan municipal corporation located in Van Buren County, Michigan.

1

3.      The other Defendant, SAFEbuilt, Inc. is a Michigan Corporation that has been retained by the Village to provide certain municipal services on behalf of the Village, including services that would normally be provided by a municipal Buildings Department.

4.      This action concerns actions taken by the Village and SAFEbuilt with respect to a piece of real property located at 310 Paw Paw Street in the Village of Decatur, in the County of Van Buren, Michigan.

5.      At all relevant times, the Village acted through its agents, employees, and instrumentalities, including, without limitation, Defendant SAFEbuilt, Inc.

### JURISDICTION AND VENUE

6.      Under Article III of the Constitution, federal courts can hear "all cases, in law and equity, arising under this Constitution, [and] the laws of the United States..." US Const, Art III, Sec 2.

7.      This Court has original jurisdiction over the federal claims of this action pursuant to 28 U.S.C. § 1331 and 1343, because the matters in controversy arise under the laws of the United States and the United States Constitution.

8.      This Court has supplemental jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. § 1367, because those state law claims are so related to the federal claims that they form part of the case and controversy under Article III of the United States Constitution, and because the federal claims set forth in this Complaint fall within this Court's original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2), because there are only two Defendants, because both Defendants reside in the State of Michigan, and because a

substantial part of the events giving rise to the Plaintiff's claims took place within the Western District of Michigan.

10.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

GENERAL ALLEGATIONS

11.     The real property that is the subject of this action (hereinafter, "the Property") is located at 310 Paw Paw Street in the Village of Decatur, in the County of Van Buren, Michigan, and is adjacent to another parcel of real property commonly known as 312 Paw Paw Street (hereinafter, the "Adjacent Property").

12.     Several decades prior to the filing of this action, the Property and the Adjacent Property were known as "Lot 6" and "Lot 7", respectively, within land records for the Village of Decatur. **Exhibit A – Property Survey.**

13.     The Property and the Adjacent Property were both under common ownership until, at some point prior to 2001, the common owner passed away, and his wife inherited both parcels.

14.     The wife of the common owner subsequently failed to pay the property taxes owed for the two parcels, which led to the Property and the Adjacent Property being sold to two different owners.

15.     The new owner of the Property also failed to pay property taxes owed for the Property and the Property was foreclosed upon and subsequently sold to a limited liability company, Denman Enterprises, LLC. **Exhibit B – Quit Claim Deed dated November 1, 2013.**

16.     On August 14, 2014, Denman Enterprises, LLC sold the Property to another individual owner, Monica Gonzalez, who subsequently sold the Property to Plaintiff. **Exhibit C – Quit Claim Deed dated August 14, 2014.**

17.     In 2001, the new owners of the Adjacent Property filed a Notice of Commencement with the Village indicating that they intended to construct a property improvement in the form of a Building Extension, which expanded the building situated upon the Adjacent Property (hereinafter, the "Neighboring Building") outward towards the direction of the Property. **Exhibit D – Notice of Commencement dated August 1, 2001.**

18.     Plaintiff recently obtained a property survey detailing the boundaries and dimensions of the Property relative to adjacent property parcels, including the Adjacent Property. **Exhibit A.**

19.     The property survey obtained by Plaintiff indicates that the Building Extension discussed in the aforementioned 2001 Notice of Commencement was, apparently, unlawfully erected, because that Building Extension caused the structure of the Neighboring Building to extend over the property line separating the Property from the Adjacent Property (the "Property Line") by a maximum length of approximately two and one-half feet (2.5'). *Id.*

20.     In the summer of 2025, Plaintiff began Plaintiff began working with Defendant SAFEbuilt, a private company that has been retained by the Village to serve as both a Building Department and Zoning Authority on behalf of the Village, to make preparations to lawfully erect a Manufactured Home upon the Property (a process referred to hereinafter as the "Project") and to obtain the necessary Building Permits and Zoning Approvals for the Project.

21.     On August 5, 2025, Plaintiff began an email correspondence with Alton Neal, an employee of SAFEbuilt, and the two discussed matters such as which zoning district was

applicable to the Property, what setbacks were applicable to buildings in that zoning district, and whether the entrance into the Manufactured Home must face Paw Paw Street or could instead face a different direction. **Exhibit E – Email Correspondence between Plaintiff and Alton Neal.**

22.     During the course of this email correspondence, Mr. Neal informed Plaintiff that the Manufactured Home which Plaintiff sought to erect upon the Property would be subject to the Zoning Ordinances applicable to "R-1" Residential Zoning Districts, that the side setbacks applicable to the Property would be eight feet (8') in length, and that the entrance into the Manufactured Home was not required to face Paw Paw Street. *Id.*

23.     Upon information and belief, Mr. Neal's statements via email correspondence were based upon his reading of Section 42 of the Code of Ordinances for the Village of Decatur (the "Code"), which provides, in pertinent part, as follows:

A.  That the Property is located within the R-1 Residential Zoning District; **Exhibit F – the Code at § 42-06.**
B.   That the term "Yard" means "an open space on the same lot with a building unoccupied and unobstructed by any portion of the structure from the ground level upward…". *Id.* at § 42-09.
C.  That the term "Lot" means a parcel of land occupied or intended for occupancy by a use permitted in [Section 42], including one main building together with its accessory buildings, open spaces and parking spaces required by this chapter, and having its principal frontage upon a street. *Id.* at § 42-09.
D.  That a "Side Yard" means "a yard between the main building and the side line of the lot, and extending from the front yard line to the rear yard line". *Id.* at § 42-09.
E.  That the minimum required Side Yard Requirements for a parcel zoned for R-1 is eight feet (8'); *Id.* at § 42-100.

24.     On August 26, 2025, Plaintiff submitted a Zoning Permit Application for the Project, which utilized information she obtained from her email correspondence with Alton Neal.

25.     On or around September 2, 2025, Plaintiff also submitted a Site Plan for the Project, the contents of which demarcated the portions of the Property on which Plaintiff intended to pour the concrete foundation for the Manufactured Home.

26.     After Plaintiff submitted her Zoning Permit Application and Site Plan to SAFEbuilt, an employee of SAFEbuilt contacted Plaintiff and requested that she demarcate the proposed location where the concrete crawl space foundation for the Manufactured Home would be poured by installing wooden stakes around the perimeter of that area, and Plaintiff's contractors complied with this request.

27.     On September 11, 2025, Alton Neal conducted a zoning inspection for the Property on behalf of SAFEbuilt.

28.     During this inspection on September 11, Mr. Neal inspected the specific portion of the Property which Plaintiff's contractors had demarcated with wooden stakes to indicate the proposed location of the concrete crawl space foundation for the Manufactured Home.

29.     Mr. Neal also investigated the boundary area between the Property and the Adjacent Property during this inspection on September 11 and, upon information and belief, during that inspection, Mr. Neal installed wooden stakes in a straight line on what he believed to be the property line that separated the Property from the Adjacent Property and then took pictures of the wooden stakes he had installed (hereinafter, the "Property Line"). **Exhibit G – Documents and Photographs Generated by Alton Neal on September 11, 2025.**

30.     The pictures taken by Mr. Neal on September 11, 2025 appear to indicate that, when Mr. Neal determined the location of the Property Line separating the Property from the Adjacent Property in order to evaluate the building setbacks applicable to the Project, he did so either by measuring out eight feet (8') from the outermost edge of the Building Extension for the Neighboring Building, or by making reference to the "mow line", that is, the portions of the Property/Adjacent Property that were regularly mowed and landscaped by the owner of the Adjacent Property. *Id.*

6

31.     Upon information and belief, the boundary areas demarcated by Mr. Neal with wooden stakes, as they appear within the photographs taken during his inspection on September 11, do not accurately reflect the setbacks which were actually applicable to the Project, because Mr. Neal's placement of the wooden stakes in the demarcated area was predicated upon Mr. Neal's determination of the location of the Property Line, and Mr. Neal's use of the methodology summarized above led him to place the Property Line in an incorrect location.

32.     As demonstrated by the survey obtained by Plaintiff, the actual location of the Property Line is situated far closer to the Adjacent Property than the inaccurate Property Line measured or assumed by Mr. Neal, and the distance between the "correct" Property Line and Mr. Neal's "incorrect" Property Line is approximately 13 to 14.5 feet. **Exhibit A, Exhibit G.**

33.     Following the inspection on September 11, 2025, Mr. Neal issued an "inspection result", which indicated that he approved the dimensions of the concrete crawl space foundation for the Manufactured Home and that he had granted zoning approval for the Project. **Exhibit H – Inspection Result dated September 11, 2025.**

34.     On October 7, 2025, a different employee of SAFEbuilt named Lance Bonifield visited the Property to perform a building inspection, the scope of which encompassed an inspection of the crawl space concrete footings for the Manufactured Home which had been staked out prior to Mr. Neal's zoning inspection on September 11, 2025.

35.     After inspecting the Property on October 7, 2025, Mr. Bonifield issued an "inspection result" for the Project. The contents of this inspection result indicate that the Permit Type sought by Plaintiff was "Residential New Pre Manufactured Home w/Crawl", that the inspection Mr. Bonifield performed was described as "Footing", that the "Inspection Step" was

listed as "Building Inspections", and that the "Result" of the inspection was "Approved". **Exhibit I – Inspection Result dated October 7, 2025.**

36.     After Mr. Bonifield performed his building inspection on October 7, 2025 and conveyed the aforementioned inspection result to Plaintiff, contractors working on behalf of Plaintiff poured concrete for the crawl space foundation of the Manufactured Home.

37.     On October 23, 2025, Mr. Bonifield once again visited the Property to perform a Final Building Inspection in relation to the Project, during the course of which he examined the crawl space foundation for the Manufactured Home.

38.     After inspecting the Property on October 23, 2025, Mr. Bonifield issued an "inspection result" for the Project. The contents of this inspection result indicated that the Permit Type sought by Plaintiff was "Residential New Pre Manufactured Home w/Crawl", that the inspection Mr. Bonifield performed was described as "Final", that the "Inspection Step" was listed as "Building Inspections", and that the "Result" of the Inspection was "Approved". **Exhibit J – Inspection Result dated October 23, 2025.**

39.     On November 20, 2025, prior to the filing of the present action, Mr. Bonifield provided Plaintiff with a Microsoft Word document that is referred to hereinafter as the "SAFEbuilt Timeline". **Exhibit K – the SAFEbuilt Timeline.**

40.     The metadata held by Microsoft Word for the SAFEbuilt Timeline indicates that the document for the SAFEbuilt Timeline was first created at 9:02 AM on November 20, 2025, and that the last modification made to the document was made at 10:52 AM the same date, meaning that the SAFEbuilt Timeline was created after most of the facts it purports to describe had already occurred. *Id.*

41.    Mr. Bonifield and SAFEbuilt have represented to Plaintiff that the SAFEbuilt Timeline is an accurate timeline of events in relation to the Project and description of the interactions between SAFEbuilt and Plaintiff in relation to the Project, as well as a determination of fault and liability against Plaintiff with respect to the dispute giving rise to the present action.

42.    As discussed in detail below, the SAFEbuilt Timeline is manifestly inaccurate and misleading in several respects.

43.    Per the SAFEbuilt Timeline, Mr. Bonifield contacted Mr. Neal regarding the Project on October 29, 2025, and, on that date, Mr. Neal informed Mr. Bonifield that Plaintiff possessed all requisite zoning approvals and that Plaintiff had been cleared to proceed with pouring the concrete foundation in relation to the Project.  **Exhibit K.**

44.    Per the SAFEbuilt Timeline, on October 30, the Village and/or SAFEbuilt apparently received "questions regarding allowable distance between R3 structures" in relation to the Property and the Adjacent Property. *Id.*

45.    Upon information and belief, the Village only has two Residential Zoning categories: R-1 and R-2, and the Code therefore does not allow for "R-3 structures". **Exhibit F***, at* § 42-100.

46.    It is unclear from the SAFEbuilt Timeline who asked these questions regarding allowable distances and what actions, if any, were taken by the Village and/or SAFEbuilt in relation to those inquiries. **Exhibit K.**

47.    To the best of Plaintiff's information and belief, between September 11, 2025 and November 11, 2025, neither Plaintiff nor any contractors employed by Plaintiff made any adjustments or alterations to the dimensions of the area which Mr. Neal had demarcated with

wooden stakes for the pouring of the concrete foundation during his zoning inspection of the Property on September 11, 2025.

48.     Entries within the SAFEbuilt Timeline posit that the following events transpired between November 10 and November 12, 2025:

A.  That, on November 10, the Village and/or SAFEbuilt received a complaint from the owner of the Adjacent Property which alleged that Plaintiff was "building too close to their structure";

B.  That, on November 10, Mr. Neal apparently issued, on behalf of the Village and SAFEbuilt, a citation for "Building Without a Permit" with respect to the Property, ostensibly because "a Manufactured Home [was] being placed on a foundation (which had a foundation only permit) located at [the Property]";

C.  That, on November 11, 2025, Mr. Neal inspected the Property to "verify the foundation was put in the correct location per setback requirements", and Mr. Neal apparently concluded that "the inspection failed because the structure was moved 5 feet to the left property line, which left 5 feet on the left side and 20 feet on the right side";

D.  That, on November 12, Mr. Neal conversed with Plaintiff regarding the alleged discrepancy in the location of the concrete footings and the setbacks between the Manufactured Home and the Property Line;

E.  That, following his conversation with Plaintiff on November 12, Mr. Neal issued a stop-work order in relation to the Project; and

F.  That, on November 12, an Office Manager of the Building Department contacted Plaintiff and explained to her that there was "an issue with the location the home was placed on the property", and this person also told Plaintiff that someone from the Village's "Building Department" would "be in touch very soon to discuss details and options to move this matter forward". **Exhibit K.**

49.     The conclusions set forth within the aforementioned entries in the SAFEbuilt Timeline dated November 10 to November 12, 2025 are erroneous and/or misleading in several respects, including, without limitation, the following:

A.  The November 10 citation issued by Mr. Neal for "Building Without a Permit" was apparently based upon inaccurate or erroneous information, as the inspection results previously issued by Lance Bonifield on October 7 and October 23, 2025 indicate that the permit type requested by Plaintiff, and approved by Mr. Bonifield, was for a "Residential New Pre Manufactured Home w/Crawl".

B. Mr. Neal's conclusion that the "structure was moved" was incorrect, and was apparently based upon inaccurate or erroneous information, as Plaintiff utilized the same dimensions approved by Mr. Neal in pouring the concrete foundation;

C. Mr. Neal's conclusion that there is only "5 feet" of clearance between the Property and the Property Line was inaccurate as the actual distance is approximately 8 feet and ten inches (8' 10");

D. The entries within the SAFEbuilt Timeline which indicate that Mr. Neal conversed with Plaintiff on November 12 shortly before he issued a stop-work order in relation to the Project on that same date are incorrect. In reality, Mr. Neal issued the stop-work order on November 11 and this occurred *before* he spoke with Plaintiff at approximately 4:48 P.M. on November 12; and

E. The entry within the SAFEbuilt Timeline which describes a telephone conversation between SAFEbuilt's Office Manager and Plaintiff taking place on November 12 is incorrect, because that telephone conversation actually occurred on November 19, 2025.  *See* **Exhibits I, J, and K.**

50.    Plaintiff maintains as follows with respect to her telephone conversation with Mr.

Neal on November 12, 2025:

A. That this conversation occurred at approximately 4:48 P.M., approximately one day after Mr. Neal issued the stop-work order on November 11, 2025;

B. That, during this conversation, Mr. Neal expressed his belief that the area of the Property that had physically demarcated with wooden stakes to indicate the proposed location for the crawl space foundation footings "must have been moved" sometime after Mr. Neal's inspection and approval of that demarcated area on September 11, 2025;

C. That Plaintiff responded to Mr. Neal's assertion by asserting that, to the best of her knowledge, neither she nor contractor's working on her behalf had moved that demarcated area;

D. That Plaintiff further informed Mr. Neal that a different building inspector had also inspected and approved the foundation footings and the final foundation and expressed her belief to Mr. Neal that that other building inspector would not have approved those elements if the demarcated area had in fact been moved; and

E. That Mr. Neal then told Plaintiff that she should contact Lance Bonifield, who was the other employee of SAFEbuilt who had inspected the foundation of the Property, and Mr. Neal provided Plaintiff with Mr. Bonifield's contact information.

51.     As a direct result of the stop-work order issued by Mr. Neal, the contractors Plaintiff hired to erect the Manufactured Home were prevented from continuing their work in compliance with the terms of the agreements between Plaintiff and those contractors, and several different entities providing utility services for the Manufactured Home were unable to proceed with installing utility infrastructure such as utility poles and gas and water meters. *Id.*

52.     During the period between the issuance of the stop-work order and November 19, 2025, Plaintiff repeatedly attempted to contact Lance Bonifield and other employees of SAFEbuilt via telephone and email to request an update regarding the status of the Project and, on several of these occasions, she conveyed that the delays associated with the stop-work order were causing her to incur significant costs in relation to the Project.  *Id.*

53.     After receiving no response to her contact attempts for several days, Plaintiff began, on November 14, 2025, to include the Village Manager of the Village as a recipient for the emails she was sending to SAFEbuilt regarding the situation. *Id.*

54.     On November 19, 2025, Plaintiff once again telephoned SAFEbuilt regarding the status of the Manufactured Home and the person who initially answered the telephone transferred her call to an individual who identified themselves as a "manager" at the SafeBuilt office located in Athens, Michigan.  *Id.*

55.     The manager who conversed with Plaintiff on November 19, 2025 told Plaintiff that she should stop including employees of the Village of Decatur as recipients on the emails she was sending to employees of SAFEbuilt regarding the status of the Manufactured Home, and also told Plaintiff that someone would call her back sometime later that same day, November 19, to provide her with some kind of "remedy option" with respect to the situation. *Id.*

56.    Throughout the remainder of November 19, 2025 after the telephone call described above, Plaintiff did not receive telephone calls from any employees of SAFEbuilt. *Id.*

57.    On November 20, 2025, Plaintiff once again telephoned SAFEbuilt regarding the situation concerning the Manufactured Home and she was once again transferred to the same "manager" with whom Plaintiff had previously spoken on November 19, 2025, and that "manager" informed Plaintiff that someone from SAFEbuilt would "for sure" contact Plaintiff regarding the situation later that same day. *Id.*

58.    During the period between November 11 and November 20, no one affiliated with SAFEbuilt and/or the Village ever submitted, to Plaintiff, any request for Plaintiff to take any specific action, such as a request that Plaintiff submit a remediation plan with respect to the Project. *Id.*

59.    The final and most recent entries in the SAFEbuilt Timeline are dated November 20, 2025 and they provide as follows:

    A.  The entries chastised Plaintiff by noting that SAFEbuilt had not received any "remediation plans or correspondence in writing regarding resolution of non-compliant building regarding setbacks";

    B.  The entries accused Plaintiff of creating "two dangerous buildings";

    C.  The entries note that all future communications between the Village/SAFEbuilt and Plaintiff must be conducted in writing;

    D.  The entries assert that the building inspection performed by Mr. Neal on November 11, 2025 failed "because the structure [on the Property] was moved 5 feet toward the existing home of neighbor, which left 5 feet on the left side and 20 feet on the right side"; and

    E.  The entries note that Lance Bonifield "will condemn and declare 310 Paw Paw Street, Decatur, Michigan a dangerous building and file the necessary documentation to do so" unless Plaintiff files a remediation plan within 15 days of November 20, 2025, i.e. prior to December 5, 2025. **Exhibit K.**

60.    The above-described entries in the SAFEbuilt Timeline dated November 20, 2025 make no mention of any other actions being taken, or of any requests being made to Plaintiff, by either the Village or SAFEbuilt during the period between November 12 and November 20. *Id.*

61.    To date, the SAFEbuilt Timeline is the only written determination issued by the Village and/or SAFEbuilt with respect to the Property or the Project.

62.    At all times prior to November 20, 2025, Plaintiff has complied with directives given to her by SAFEbuilt's employees and has acted in reasonable reliance upon the approvals granted by those employees with respect to the Project, which unambiguously authorized Plaintiff to pour the concrete foundation and to erect the Manufactured Home on the Property.

63.    Upon information and belief, the Village and SAFEbuilt are incorrect in their assertion that deficiencies exist in the clearances between the Property and the Property Line, because their conclusions are based on the inaccurate measurements of the Property Line taken by Alton Neal during his inspection on September 11, 2025 and did not reflect the actual location of the Property Line. **Exhibit A, Exhibit G**.

64.    Upon information and belief, the actual clearances between the Manufactured Home erected on the Property and the Property Line comply with the applicable provisions of the Code because the distance is approximately 8 feet, 10 inches (8' 10") and the Minimum Side Yard clearance required by the Code for the Manufactured Home is 8 feet (8'). **Exhibit F**, at § 42-100.

65.    To the extent that there are any deficiencies in the clearances between the buildings erected on the Property and on the Adjacent Property, such deficiencies were not clearly referenced by SAFEbuilt within the SAFEbuilt Timeline, and any such deficiencies would have been caused either by the unlawful actions taken by the owner of the Adjacent Property, whose building illegally intrudes across the Property Line and into the Property, or by the negligence of SAFEbuilt's employees in failing to accurately determine the location of the Property Line.

66. On November 21, 2025, counsel for Plaintiff sent correspondence to the Village and to SAFEbuilt via email and certified mail regarding the dispute concerning the Property. **Exhibit L – Written Correspondence to Defendants dated November 21, 2025.**

67. In that correspondence, Plaintiff's counsel informed SAFEbuilt and the Village that the determinations made by SAFEbuilt were erroneous, demanded that they withdraw their unreasonable demand for Plaintiff to submit a remediation plan as well as their unlawful threat to condemn the Property, and requested that a legal representative of the Village and/or SAFEbuilt contact counsel for Plaintiff on or before 5:00 PM on Tuesday, November 25, 2025 to discuss a resolution to this dispute. *Id.*

68. Neither SAFEbuilt, nor the Village, nor any employee of those two entities contacted Plaintiff's counsel regarding the aforementioned correspondence dated November 21.

69. On December 5, 2025, Plaintiff, through her counsel, timely submitted a remediation plan to SAFEbuilt, the contents of which informed SAFEbuilt regarding the inaccuracies in the measurements of the Property Line taken by Mr. Neal and further informed SAFEbuilt that the Manufactured Home that Plaintiff erected did comply with the clearances applicable to the Property under the Code. **Exhibit M – Remediation Plan dated December 5, 2025.**

70. Within her Remediation Plan, Plaintiff also expressed that she had acted in reasonable reliance upon the permits and approvals granted by SAFEbuilt, and therefore, SAFEbuilt should bear the cost of any remediation ordered with respect to the Property. *Id.*

71. Within her Remediation Plan, Plaintiff also requested that a legal representative of the Village and/or SAFEbuilt contact Plaintiff's counsel to discuss this matter no later than December 9, 2025. *Id.*

72.     As of the date of this Complaint, neither SAFEbuilt, nor the Village, nor any employee of either of those two entities contacted Plaintiff's counsel regarding the aforementioned correspondence dated November 21, 2025 or the Remediation Plan dated December 5, 2025 and, upon information and belief, the Village, acting on flawed and inaccurate conclusions reached by SAFEbuilt, is still presently threatening to condemn the Manufactured Home which Plaintiff has erected on the Property.

73.     § 42-371 of the Code provides that "[t]he provisions of this chapter shall be administered and enforced by the zoning administrator or by such deputies of this department as the zoning administrator may delegate to enforce the provisions of this chapter". **Exhibit F**, at § 42-371.

74.     The website maintained by the Village contains a section titled "Building Department", which provides, in pertinent part, that "[t]he Village of Decatur has partnered with SAFEbuilt to administer our building, zoning, mechanical, electrical, and plumbing codes and the associated permits beginning July 17th, 2021". **Exhibit N – Website for the Village – Building Department.**

75.     The same section of the Village website further indicates that Lance Bonifield, an employee of SAFEbuilt, serves as the current Zoning Administrator for the Village. *Id.*

76.     Within the email correspondence between Plaintiff and Alton Neal, the signature line for Mr. Neal indicates that Mr. Neal's job titles were "Zoning Administrator, Code Enforcement Officer, Rental Inspector". **Exhibit E**.

77.     § 42-372 of the Code provides, in pertinent part, that "[i]t shall be unlawful for the zoning administrator to approve any plans or issue any permits or certificates of occupancy for any

excavation or construction until he has inspected such plans in detail and found them to conform with this chapter". **Exhibit F**, at § 42-372.

78.     § 42-372 of the Code also provides that "the zoning administrator shall not refuse to issue a permit whenever all conditions and requirements imposed by this chapter are complied with". *Id.*

<u>COUNT I</u>
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH
AMENDMENT OF THE UNITED STATES CONSTITUTION**

79.     Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

80.     The Due Process Clause set forth in the Fourteenth Amendment to the United States Constitution provides that governments shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

81.     The Due Process Clause offers two separate categories of protections, namely: substantive due process and procedural due process.

82.     In the present case, Plaintiff is alleging that the Defendants violated both her right to procedural due process and her right to substantive due process.

83.     In resolving the procedural due process claim, the first issue is whether the plaintiff has been deprived of a protected property interest. *Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005).

84.     An actionable property interest protected by the Due Process Clause of the Fourteenth Amendment is created by "existing rules or understandings that stem from an independent source such as state law" and the dimensions of that property interest are also defined by the provisions of that independent source. *Board of Regents of State Colleges v. Roth*, 408 U.S.

17

564, 577 (1972). To have a property interest in a benefit, a person must have a legitimate claim of entitlement to it, rather than an abstract desire for it or a unilateral expectation of it. *Id.* at 577.

85.　　The holder of a building or zoning permit has a constitutionally protected interest and is therefore entitled to proper proceedings prior to a final determination regarding revocation. *See Tri-Corp Management Co v Praznik*, 33 F App'x 742, 747-48 (6th Cir 2002) (unpublished).

86.　　Michigan Courts have recognized that reasonable reliance of a homeowner upon a valid permit granted by a municipality can create an enforceable property interest which entitles the homeowner to due process protections. *See Duncan v. City of Detroit*, 200 Mich App 111 (1993); *see also Mason v Wayne County*, 279 Mich App 555 (2008) (holding that homeowners can have reasonable reliance on issued permits, creating substantial interests protected under the law).

87.　　Michigan Courts have also recognized that municipal approvals granted to homeowners can create actionable property interests subject to due process protections. *See Datema v St Clair County*, 286 Mich App 27 (2009) (holding that property rights of individuals are affected by governmental decisions that create reasonable reliance, leading to expectations of entitlement); *see also McDonald v Village of New Haven*, 329 Mich App 87 (2019) (holding that zoning decisions and permits can establish a legitimate expectation of continued use of property).

88.　　In the present case, SAFEbuilt's employees, acting under color of state law and on behalf of the Village, unambiguously represented to both Plaintiff and to each other that Plaintiff possessed all of the requisite zoning and building permits and municipal approvals needed for her to proceed with pouring the concrete foundation and erecting the Manufactured Home on the Property and that Plaintiff was authorized to proceed with taking those actions. *See* **Exhibits H, I, J, and K.**

89.     At all times prior to November 20, 2025, Plaintiff complied with directives given to her by SAFEbuilt's employees with respect to the Project and acted in reliance upon the approvals and permits granted by those employees with respect to the Project in expending significant funds in connection with the Project to erect a Manufactured Home on the Property.

90.     Plaintiff's reliance on the approvals and permits issued by SAFEbuilt was clearly reasonable given that those approvals and permits were issued by employees of SAFEbuilt who were designated to serve as Zoning Administrators and Building Inspectors for the Village, and given the wording of § 42-372 of the Code, which provides that it is unlawful for the Village's Zoning Administrator "to approve any plans or issue any permits… until he has inspected such plans in detail and found them to conform with this chapter". **Exhibit F**, at § 42-372.

91.     Despite Plaintiff having acted in compliance with the directives provided by SAFEbuilt and in reasonable reliance upon the zoning and building permits and approvals previously granted by SAFEbuilt, the Defendants now assert that the Project does not comply with the Code and have demanded that Plaintiff effectuate substantial and costly changes to the Project after the concrete foundation has already been poured and the Manufactured Home has already been erected. **Exhibit K.**

92.     Plaintiff has already sustained substantial financial damages as a direct result of the delays and work stoppages caused by the stop-work order improperly issued by SAFEbuilt on November 11, 2025.

93.     If Plaintiff is forced to remediate the Project pursuant to the demands issued by SAFEbuilt, she will be forced to remove all or part of the concrete foundation poured under the Property, to deconstruct all or a substantial portion of the Manufactured Home previously erected

on the Property, and to modify the foundation and/or the Manufactured Home to meet the new standards determined by SAFEbuilt, the total cost of which could be in excess of $72,000. *Id.*

94.     Absent her reasonable but detrimental reliance upon the representations, permits, and approvals issued by SAFEbuilt, Plaintiff would not have incurred the aforementioned substantial financial damages and would not be threatened with even more serious financial damages involved with remediating the Project to the new standards determined by SAFEbuilt.

95.     Accordingly, Plaintiff possesses an actionable property interest in the approvals and permits granted by the Defendants with respect to the Project and Plaintiff was therefore entitled to due process protections afforded by the Fourteenth Amendment.

96.     After determining whether the plaintiff was deprived of a property interest, the second step in the procedural due process analysis is determining whether the deprivation of the property interest by the party acting under color of state law contravened notions of due process. *Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005).

97.     The guarantee of procedural due process requires "notice and an opportunity to be heard" prior to a deprivation of life, liberty, or property, as well as "a decision by an impartial decision-maker[.]" *Bonner v City of Brighton*, 495 Mich 209, 235, 238; 848 NW2d 380 (2014). Before a plaintiff can be deprived of a property interest, they must be afforded due process with procedures that are tailored to the capacities and circumstances of those who are to be heard, and which ensure that the plaintiff is given a meaningful opportunity to present their case. *Id.* at 238-239; s*ee also Cleveland Board of Education v Loudermill*, 470 US 532 (1985) (holding that property cannot be taken without notice and a meaningful opportunity to be heard).

98.     Under Sixth Circuit precedent, a plaintiff can prevail on a procedural due process claim by demonstrating that the property deprivation resulted from either: (1) an established state

procedure that itself violates due process rights, or (2) a "random and unauthorized act" causing a loss for which available state remedies would not adequately compensate the plaintiff. *Id. quoting Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir.1991).

99.    A plaintiff alleging the first option for the test set forth in *Macene* does not need to demonstrate the inadequacy of state remedies. *Id. quoting Moore v. Bd. of Educ. of Johnson City Sch.*, 134 F.3d 781, 785 (6th Cir.1998).  A plaintiff pursuing the second line of argument must navigate the rule of *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), which holds that a state may satisfy procedural due process with only an adequate postdeprivation procedure when the state action was "random and unauthorized", assuming that the *Parratt* rule is applicable to the facts of the case.  *See Macene*, 951 F.2d at 706. In this context, "unauthorized" means that the official in question did not have the power or authority to effect the deprivation, not that the act was contrary to law. *Id.* at 138, 110 S.Ct. 975.

100.    Subsequent federal rulings have narrowed the holding in *Parratt* such that it is only applicable to situations where predeprivation process would have been impossible or impractical. *See Zinermon v. Burch*, 494 U.S. at 128, 110 S.Ct. 975.

101.    In the present case, the only written communication provided to Plaintiff concerning SAFEbuilt's determinations with respect to the Property was the SAFEbuilt Timeline referenced above, which Lance Bonifield sent to Plaintiff on November 20, 2025. **Exhibits F and K.**

102.    Within the SAFEbuilt Timeline, SAFEbuilt informed Plaintiff that SAFEbuilt's employees had summarily determined that the Manufactured Home Plaintiff erected on the Property was not in compliance with the Code, that Plaintiff was to blame for that noncompliance,

and that Plaintiff must submit a remediation plan within 15 days or else the Manufactured Home erected upon Property would be condemned. **Exhibit K.**

103.    The SAFEbuilt Timeline contained numerous material inaccuracies and omissions which directly undermined the conclusions set forth therein, and the SAFEbuilt Timeline neither apprised Plaintiff regarding the legal authority underlying SAFEbuilt's determinations, nor provided Plaintiff with any meaningful opportunity to dispute SAFEbuilt's summary conclusions prior to the deadline for submission of a remediation plan and the condemnation of the Property, such as an administrative hearing.  *Id.*

104.    The actions of the Village and SAFEbuilt in sending Plaintiff the SAFEbuilt Timeline and demanding remediation, all without giving Plaintiff a hearing or an opportunity to plead her position, constitute a "random and unauthorized act" causing a loss for which available state remedies would not adequately compensate Plaintiff.

105.    In determining the constitutional sufficiency of administrative procedures in the context of procedural due process, Courts  consider the following three factors: (1) the interests of the individual in retaining their property and the injury threatened by the official action, (2) the risk of error through the procedures used and probable value, if any, of additional or substitute procedural safeguards, and (3) the costs and administrative burden of the additional process, and the interests of the government in efficient adjudication. *Mathews v Eldridge*, 424 US 319 (1976).

106.    In applying the test set forth in *Mathews v Eldridge*, the Supreme Court of the United States has generally held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property. *See, e.g., Cleveland Board of Education v. Loudermill*, 470 U. S. 532, 470 U. S. 542 (1985) ("the root requirement' of the Due Process Clause"

is "that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest"); *see also Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir.1994).

107.    The U.S. Supreme Court has held that, under certain exceptional circumstances in which a pre-deprivation hearing is either pointless or unrealistic, the requirements of due process may be satisfied by either a statutory provision for a post-deprivation hearing, or a common law tort remedy for erroneous deprivation. *See, e.g., Parratt v. Taylor, 451 U. S. 527 (1981) (*the tort remedy was all the process the prisoner was due, because any predeprivation procedural safeguards the State did provide or could have provided would not address the risk of this kind of deprivation, as the very nature of a negligent loss of property made it impossible for the State to predict such deprivations and provide predeprivation process); *Logan v. Zimmerman Brush Co.,* 455 U. S. 422, 455 U. S. 436 (1982) ("the necessity of quick action by the State or the impracticality of providing any predeprivation process,'" may mean that a postdeprivation remedy is constitutionally adequate, *quoting Parratt v. Taylor, 451 U.S. at 451 U.S. 539)*.

108.    Plaintiff's procedural due process claim is not subject to the *Parratt* rule, regardless of whether Plaintiff characterizes SAFEbuilt's actions as an established state procedure or as an attack on a "random and unauthorized" act, because it clearly would not have been impossible or even difficult for the Defendants to hold a pre-deprivation hearing with Plaintiff's involvement before they summarily issued their determinations via the SAFEbuilt Timeline and, even if the *Parratt* rule did apply, given the vague and informal nature of the SAFEbuilt Timeline, it is unclear whether any remedies were available to Plaintiff under state law.

109.    Entries in the SAFEbuilt Timeline establish that SAFEbuilt has assumed, incorrectly and without any valid basis, that Plaintiff "moved" the boundaries of the area previously "staked" by Alton Neal for the pouring of the concrete foundation, and that these

alleged actions by Plaintiff have necessitated the filing of a remediation plan with respect to the Project. **Exhibit K.**

110.    SAFEbuilt's actions in requiring Plaintiff to submit a remediation plan necessarily presuppose that the Manufactured Home erected by Plaintiff does not comply with the applicable zoning ordinance and building standards, that Plaintiff was to blame for that noncompliance, and that Plaintiff is liable to pay for the cost of remediating the Project, all of which assumptions are incorrect and are refuted by Plaintiff.

111.    In demanding that Plaintiff submit a remediation plan, SAFEbuilt's employees summarily determined liability and fault on the part of Plaintiff and either disregarded or failed to adequately investigate Plaintiff's contrary positions with respect to the Project.

112.    Even if SAFEbuilt's demand for Plaintiff to submit a remediation plan is not construed as a summary determination of fault and liability against Plaintiff, the deadline applicable to Plaintiff's submission of the remediation plan (i.e. 15 days) is unusually brief given the significant time and considerable expenses which such remediation would likely entail.

113.    Because of the aforementioned short 15-day deadline for the submission of a remediation plan, Plaintiff was unable to obtain detailed estimates regarding the scope and cost of excavation and construction work that would be necessary to perform the unwarranted remediation demanded by SAFEbuilt. **Exhibit F.**

114.    Following the submission of Plaintiff's remediation plan on December 5, 2025, the Defendants failed to provide any response to the points raised in that correspondence and they did not even confirm receipt of Plaintiff's remediation plan. *Id.*

115.    For this reason, even if SAFEbuilt's demand for a remediation plan is interpreted as providing Plaintiff with some semblance of an opportunity to be heard, the abbreviated deadline

arbitrarily imposed by SAFEbuilt will nonetheless function to prevent Plaintiff from enjoying procedures that are tailored to her capacities and circumstances and that abbreviated deadline actively served to deprive Plaintiff of a meaningful opportunity to present her case.

116.    The administrative procedures observed by Defendants with respect to their decision regarding the Project are manifestly insufficient under the standard promulgated in *Mathews v Eldridge*, 424 US 319 (1976), because the Defendants' actions resulted in severe financial harm to Plaintiff by depriving her of the Manufactured Home and forcing her to perform costly remediation, because their failure to grant Plaintiff any pre-deprivation hearing to contest the findings of SAFEbuilt's employees functions to greatly increase the risk of error in SAFEbuilt's decision-making process, and because the costs and administrative burdens associated with giving Plaintiff an opportunity or a hearing in which to contest the findings of SAFEbuilt's employees would be minimal.

117.    In the present case, it is readily apparent that the Defendants, who were acting under color of law, could easily have implemented pre-deprivation procedural safeguards, such as granting Plaintiff a pre-deprivation administrative hearing, and that such procedural safeguards would address and mitigate the risk of an erroneous deprivation of a protected property right, as has occurred in the present case.

118.    To date, neither of the Defendants have demonstrated that there existed a manifest need for quick action or other exceptional circumstances that would or could justify them denying a pre-deprivation hearing to Plaintiff.

119.    In light of the foregoing, the limited exception to the general rule requiring a hearing *before* a person acting under color of state law deprives a person of a property interest, as

delineated by the U.S. Supreme Court in *Parratt v. Taylor,* 451 U. S. 527 (1981) and its progeny, is clearly inapplicable to the present case.

120.    By infringing upon Plaintiff's property rights without giving her adequate notice or any meaningful opportunity to present her case, SAFEbuilt has violated Plaintiff's rights to procedural due process under the Fourteenth Amendment.

121.    The guarantee of substantive due process "'bar[s] certain government actions regardless of the fairness of the procedures used to implement them[.]'" *Mettler Walloon, LLV v Melrose Twp*, 281 Mich App 184, 197; 761 NW2d 293 (2008). In substantive-due-process disputes over municipal actions, the proper inquiry is whether there was egregious or arbitrary governmental conduct." *Id*.

122.    A government action violates substantive due process when it is "arbitrary and capricious", when it is "not reasonably related to a legitimate governmental interest," or when it "shocks the conscience." *Pearson v City of Grand Blanc*, 961 F2d 1212 (6th Cir 1992); Tri-Corp Mgmt. Co. v. Praznik, 33 Fed. Appx. 742, 747 (6th Cir. 2002).

123.    Actions taken by a municipality are "arbitrary" or "capricious" when they are taken without a rational basis or when they are clearly unreasonable. *Bine v City of Detroit*, 225 Mich App 59 (1997). Municipal actions must have a basis in the facts of the situation and not be taken out of spite or for other irrational reasons. *Id.*

124.    Conduct can be deemed to shock the conscience if that conduct "violates the 'decencies of civilized conduct'". *Range v Douglas*, 763 F.3d 573 (6th Cir. 2014), *quoting Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998). This includes actions "so 'brutal' and 'offensive' that [they do] not comport with traditional ideas of fair play and decency." *Cnty. of Sacramento v. Lewis* at 847, *quoting Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).

125.    In the present case, SAFEbuilt has failed to provide any adequate explanation which justifies its efforts to force Plaintiff to undergo the arduous and expensive process of remediation, and the limited evidence cited by SAFEbuilt with respect to its demands for remediation is irrational, contradictory, and self-serving. **Exhibit K.**

126.    SAFEbuilt's assertion that the clearances for the Property do not comply with the applicable zoning ordinance are contradicted by measurements taken by Plaintiff, which show that no deficiency exists in those clearances. **Exhibit F.**

127.    SAFEbuilt's assertion that Plaintiff "moved" the demarcated area for the concrete foundation is contradicted by the testimony of Plaintiff and Plaintiff's contractors, which indicates that the demarcated area was not moved. **Id.**

128.    SAFEbuilt's assertion that Plaintiff "created two dangerous buildings" is belied by SAFEbuilt's own timeline of events, which acknowledges that Alton Neal and Lance Bonifield conducted three (3) separate inspections of the Property and that they concluded that the Project "passed" each of those inspections, as well as other entries which stated that Plaintiff possessed the zoning clearances necessary to begin working on the Project. **Exhibit K.**

129.    There is also significant evidence suggesting that SAFEbuilt has attempted to diminish or obfuscate the role played by its employees in creating reasonable expectations of reliance on the part of Plaintiff, as demonstrated by the following conspicuous inconsistencies between the SAFEbuilt Timeline and the actual course of events:

A. The SAFEbuilt Timeline fails to mention that Lance Bonifield (the individual who created the document) conducted two building inspections at the Property on October 7 (when he inspected the disputed concrete footings) and on October 23 (when he performed a final building inspection), and that Mr. Bonifield approved the Project on both of these occasions.

B.  The SAFEbuilt Timeline asserts that Alton Neal issued a Building Without Permit citation "due to a Manufactured Home being placed on a foundation (which had a

27

foundation only permit)". This contention is belied by the inspection results issued by Lance Bonifield on October 7 and October 23, which show that Mr. Bonifield issued final building clearance in connection with the Project.

130.    Several actions taken by SAFEbuilt after November 11, 2025, can be reasonably interpreted as measures taken by SAFEbuilt in anticipation of litigation which were intended to deflect scrutiny away from the role played by SAFEbuilt's employees with respect to the Project, including SAFEbuilt's refusal to contact Plaintiff between November 12 and November 20, despite numerous efforts by Plaintiff to contact SAFEbuilt during that same period and SAFEbuilt's decision on November 20 to require that all future interactions between Plaintiff and SAFEbuilt be conducted in writing. **Exhibit K.**

131.    The general lack of factual support for SAFEbuilt's conclusions and the contradictory and self-serving nature of the evidence selectively presented by SAFEbuilt, demonstrates that SAFEbuilt's determinations with respect to the Project, as set forth in the SAFEbuilt Timeline, were arbitrary and capricious.

132.    As noted above, SAFEbuilt's employees issued building and zoning approvals and permits to Plaintiff, but later deprived Plaintiff of the use and possession of her Manufactured Home after Plaintiff had already expended significant financial resources while acting in reasonable reliance on those approvals and permits, and those same employees then sought to cast blame and liability upon Plaintiff for consequences resulting from their own actions. **Exhibit K.**

133.    The actions of SAFEbuilt's employees, as summarized above, amount to self-interested and self-serving victim-blaming; they are too offensive to comport with traditional ideas of fair play and decency, and they are so gross and unreasonable as to shock the conscience.

134.     SAFEbuilt's summary attribution of fault and liability against Plaintiff, which was entered without giving Plaintiff any hearing or meaningful opportunity to address and/or refute SAFEbuilt's conclusions, lacks any rational basis and does not advance any legitimate purpose.

135.     For the foregoing reasons, SAFEbuilt has violated Plaintiff's right to substantive due process under the Fourteenth Amendment to the United States Constitution.

136.     As a result of the Defendants' actions, which violated Plaintiff's procedural and substantive due process rights, Plaintiff has been injured and has suffered damages in an amount to be determined at trial.

### COUNT II
### FEDERAL TAKINGS CLAUSE
### (Fifth Amendment, United States Constitution; 42 U.S.C. § 1983)

137.     Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

138.     The Fifth Amendment of the United States Constitution, made applicable to the states via the Fourteenth Amendment, is a constitutional provision and right requiring the payment of just compensation upon a taking of private property by Defendants. U.S. Const. amend. V; *see also Knick v Twp of Scott*, 588 US ____ (2019).

139.     A regulation that deprives a landowner of all economically viable use of their property constitutes a taking under the Fifth Amendment, requiring just compensation. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014-1019 (1992) (holding that a regulation" 'goes too far'" and results in a taking "at leas[t] in the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted").

140.     Given the location, zoning, and limited spatial parameters of the Property giving rise to this claim, the only economically viable use of the Property is for the construction of

residential housing, which is the very use to which Plaintiff sought to develop the Property. **Exhibit F.**

141.    The Defendants' actions, as described above, have legally enjoined Plaintiff from continuing with the construction of the Manufactured Home and the development of the Property towards its only economically-viable usage and have therefore effectively deprived her of any use of the Property.

142.    The Defendants' actions therefore constitute a seizure of Plaintiff's property without just compensation, in violation of the Fifth Amendment of the United States Constitution.

143.    This claim is being made against all Defendants pursuant to 42 U.S.C. § 1983 and § 1988.

144.    Prior to 2019, controlling federal case law precedent generally required that a property owner first seek just compensation through state procedures before bringing a federal takings claim pursuant to 42 U.S.C. § 1983. *See Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985).

145.    In *Knick v. Township of Scott*, 139 S. Ct. 2162; 204 L. Ed. 2d 558; 588 U.S. _____ (2019), the U.S. Supreme Court overruled its prior holding in *Williamson County*, finding that a state-litigation requirement "imposes an unjustifiable burden on takings plaintiffs", and ruling that a property owner "has an actionable Fifth Amendment takings claim when the government takes his property without paying for it" and that such a property owner "may bring [a] claim in federal court under §1983 at that time".

146.    To date, the SAFEbuilt Timeline is the only written correspondence Plaintiff has received from the Village or SAFEbuilt with respect to their enforcement actions vis-à-vis the Property. **Exhibits F and K**.

30

147.    Within the SAFEbuilt Timeline, SAFEbuilt summarily concluded that the Property was not in compliance with the applicable zoning ordinance and that Plaintiff was the party who caused that noncompliance demanded that Plaintiff submit a remediation plan with respect to the Property within 15 days of November 20, 2025. **Exhibit K.**

148.    Plaintiff duly complied with SAFEbuilt's demand by submitting a remediation plan to SAFEbuilt and the Village on December 5, 2025, the contents of which articulated that, contrary to SAFEbuilt's assertions, the Property did comply with the applicable zoning ordinance and that actions taken by SAFEbuilt's employees and the owner of the Adjacent Property, and not actions taken by Plaintiff, were the cause of any apparent noncompliance. **Exhibit M.**

149.    Plaintiff's correspondence to Defendants dated December 5, 2025 also requested that Defendants schedule an administrative hearing to allow Plaintiff to contest SAFEbuilt's evidentiary conclusions, that they confirm receipt of that correspondence, and that a legal representative of the Defendants contact Plaintiff's counsel. *Id.*

150.    As of the date of this Complaint, neither the Defendants nor any person acting on their behalf has contacted Plaintiff or her counsel with respect to Plaintiff's correspondence dated December 5, 2025. **Exhibit F.**

151.    Under the Supreme Court's holding in *Knick v. Township of Scott*, *supra*, Plaintiff is not required to demonstrate that she has exhausted all potential state law remedies before filing a federal takings claim in federal court.

152.    Furthermore, given the vague and informal nature of the SAFEbuilt Timeline and the Defendants' failure to schedule a hearing or respond to Plaintiff's correspondence dated December 5, 2025, it is unclear whether and to what extent any additional state law remedies are or would be available to Plaintiff with respect to this dispute.

153.    The Defendants' actions have deprived Plaintiff of any economically viable use of her property without due process.

154.    The Defendants' actions did not substantially advance a legitimate state interest.

155.    Defendants have provided no compensation to Plaintiff for the taking of her Manufactured Home, thereby depriving Plaintiffs of her constitutional rights in violation of the Fifth Amendment of the United States Constitution.

156.    As a result of the Defendants' actions, Plaintiff has been injured and has suffered damages in an amount to be determined at trial.

**COUNT III**
**INVERSE CONDEMNATION CLAIM MICHIGAN TAKINGS CLAUSE**
**(Article X, § 2, Michigan Constitution of 1963)**

157.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

158.    This claim is being made against all Defendants pursuant to 28 U.S.C. § 1367.

159.    Article X, § 2 of the Michigan Constitution of 1963 is a provision and right requiring the payment of just compensation upon a taking of private property by Defendants. *See Knick v Twp of Scott,* 588 US ____ (2019).

160.    Under Michigan law, a taking may occur through actions that effectively limit the use of property, thereby necessitating just compensation. *See Kalamazoo River Cleanup Coalition v. Kalamazoo Valley Wastewater Reclamation Authority*, 648 N.W.2d 650 (Mich. Ct. App. 2002)

161.    Property owners whose property has been seized in violation of Article X, § 2 of the Michigan Constitution of 1963 are entitled to fair market value compensation based on the highest and best use of their property at the time of taking, and such compensation must account

not only for direct physical loss but also for losses incurred as a result of the taking. *Cramton v. State of Michigan*, 85 Mich. App. 593, 271 N.W.2d 264 (1978).

162.    As outlined above, the Defendants' actions deprived Plaintiff of the use and possession of her newly erected Manufactured Home, thereby effectively taking her property through governmental policy and regulation and without offering any compensation for these takings.

163.    The Defendants' actions did not substantially advance a legitimate state interest.

164.    As a direct and proximate result of the Defendants' actions, Plaintiff has been deprived of the ordinary use of her property and has suffered damages for which they are entitled to just compensation.

165.    Defendants have not provided any just compensation to Plaintiff in relation to their taking of Plaintiff's property.

166.    The Defendants' actions therefore constitute an unlawful seizure of Plaintiff's property without just compensation, in violation of Article X, § 2 of the Michigan Constitution of 1963.

167.    As a result of the Defendants' actions and failure to pay just compensation, Plaintiff has been injured and suffered damages in an amount to be determined at trial.

## COUNT IV
## NEGLIGENCE OF DEFENDANT SAFEbuilt, Inc.

168.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

169.    Under Michigan law, the elements of a negligence claim are: (1) a duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) causation; and (4) damages." *Lund v W Mich Regional Airport Authority*, 733 F3d 198 (6th Cir 2013).

170.    The Defendant, SAFEbuilt, Inc., is a private entity which has been retained to provide building inspection services, building permit services, and zoning approval services to the other Defendant, the Village of Decatur.

171.    When performing services on behalf of a municipality, independent contractors are held to the standard of care expected of reasonable professionals in their field. *Rouch World LLC v Department of Transportation*, 282 Mich App 486 (2009); *see also McDonald v Village of New Haven*, 329 Mich App 87 (2019) (holding that the contractor working on behalf of the municipality owed a duty to perform its inspections competently and reasonably and had a duty to exercise the level of care that a reasonable inspector would provide).

172.    As previously stated, employees of SAFEbuilt inspected the Property in relation to the Project on at least three occasions on September 11, October 7, and October 23, 2025, and those employees determined that the Project had passed each inspection.

173.    At all times prior to November 20, 2025, Plaintiff complied with directives given to her by SAFEbuilt's employees and acted in reasonable reliance upon the approvals granted by those employees with respect to the Project.

174.    In pouring the concrete foundation for the Project and erecting the Manufactured Home on the Property, Plaintiff specifically relied upon the measurements and dimensions of the area of the Property that was "staked" out by Alton Neal during his inspection of the Property on September 11, 2025, and Plaintiff maintains that neither she nor her contractors moved or adjusted the "staked" area after September 11.

175.    If, as asserted by SAFEbuilt, there exist any deficiencies in the clearances between the buildings currently situated upon the Property and the Adjacent Property, the existence of such deficiencies were or should have been readily apparent to Alton Neal during his inspection of the

34

Property on September 11, 2025 and/or to Lance Bonifield during his two building inspections of the Property on October 7 and October 23, 2025, and one or both of those employees of SAFEbuilt should have informed Plaintiff regarding those deficiencies or the potential for such deficiencies.

176.    By failing to notify Plaintiff regarding the existence or potential existence of deficiencies in the clearances between the buildings currently situated upon the Property and the Adjacent Property, SAFEbuilt failed to exercise the level of care that a reasonable zoning and building inspector would provide.

177.    As a direct and proximate result of SAFEbuilt's breach of its duty of care, Plaintiff has incurred significant financial damages resulting from the work stoppages attributable to the stop-work order issued by Alton Neal with respect to the Project on November 11, 2025.

178.    Absent timely action by this Court, Plaintiff will also be forced to incur additional and substantial financial as a direct and proximate result of SAFEbuilt's decision to order Plaintiff to undertake remediation with respect to the Project.

179.    As a result of the Defendants' actions and policies, Plaintiff has been injured and has suffered damages in an amount to be determined at trial.

**COUNT V**
**EQUITABLE ESTOPPEL AS TO DEFENDANT SAFEbuilt, Inc.**

180.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

181.    The doctrine of equitable estoppel prevents a party from asserting a claim or defense that is contrary to its previous conduct if that conduct induced reliance by another party to its detriment. The essential elements of equitable estoppel include: (1) a representation or inducement by one party; (2) reliance by the other party to its detriment; and (3) an unconscionable

injury if the first party is allowed to deny the representation. *Ranch v City of Southfield*, 128 Mich App 741, 746 (1983).

182.    In the present case, SAFEbuilt unambiguously represented that Plaintiff possessed all the necessary approvals and permits to pour the concrete foundation and erect the Manufactured Home in the context of the Project when SAFEbuilt's employees issued clear and unambiguous approvals in connection with the Project following zoning and building inspections on September 11, October 7, and October 23, 2025. *See* **Exhibits H, I, J, and K.**

183.    Plaintiff was entitled to rely upon the approvals and permits issued by SAFEbuilt given the wording of § 42-372 of the Code, which provides that it is unlawful for the Village's Zoning Administrator "to approve any plans or issue any permits… until he has inspected such plans in detail and found them to conform with this chapter". **Exhibit F**, at § 42-372.

184.    After November 20, 2025, SAFEbuilt began claiming that Plaintiff exceeded the scope of the approvals and permits previously granted by SAFEbuilt's employees in relation to the Project, and SAFEbuilt's employees have specifically asserted that Plaintiff placed "a Manufactured Home… on a foundation (which had a foundation only permit)". **Exhibit K.**

185.    The foregoing claim by SAFEbuilt is false, and it is belied by the inspection approvals issued by Lance Bonifield on October 7 and October 23, 2025, and in reality, Plaintiff has fully complied with directives given to her by SAFEbuilt's employees and has always acted in reasonable reliance upon the approvals granted by those employees with respect to the Project.

186.    SAFEbuilt's decision to order Plaintiff to undertake remediation with respect to the Project was predicated upon, and was a direct and predictable result of, its refusal to acknowledge its previous issuance of approvals and permits in relation to the Project.

187.    Plaintiff will suffer severe financial damages if SAFEbuilt is permitted to falsely deny its issuance of approvals and permits in relation to the Project, as she will be required to undertake remediation in relation to the Project will incur substantial costs in relation to such remediation.

188.    The injuries threatened to Plaintiff in these circumstances are unconscionable, because they are severe, not trivial or minor, because they are a direct result of Plaintiff's reasonable reliance on the experience and expertise of SAFEbuilt's employees, and because the facts surrounding SAFEbuilt's production of the SAFEbuilt Timeline appear to demonstrate that efforts have been taken by SAFEbuilt's employees to mitigate or obfuscate the role that they played in creating detrimental reliance on the part of Plaintiff.

189.    The injuries threatened to Plaintiff in these circumstances should also be considered unconscionable as a matter of public policy, because allowing contractors working on behalf of municipalities to backtrack on their prior representations, permits, and approvals would undermine trust in governmental processes or adversely affect other members of the community.

190.    Accordingly, SAFEbuilt must be estopped from asserting during the course of this action that it issued permits and approvals in relation to the Project or that Plaintiff lacked permits or approvals in relation to the Project.

## COUNT VI
## 42 U.S.C. § 1983 AS TO BOTH DEFENDANTS

191.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

192.    42 U.S.C. §1983 prohibits the deprivation, under color of state law, of rights secured by the Constitution of the United States and provides for civil liability on the part of parties engaging in such conduct.

193.    A property owner may bring a takings claim under § 1983 against a governmental entity when a regulation effectively deprives that property owner of the use of their property without just compensation. *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725 (1997).

194.    A property owner bringing such a claim must demonstrate that (1) the action constitutes state action, (2) the government regulation at issue results in a violation of constitutional rights by depriving the property owner of all economically viable use of their property, thus constituting a taking that requires just compensation, and (3) there are no adequate state remedies available to address the alleged taking. *Id.*

195.    A plaintiff bringing a claim under § 1983 is not required to exhaust all available state judicial and administrative remedies. *See Patsy v. Board of Regents of State of Florida, 457 U.S. 496, 506 (1982)* (the legislative history supports the conclusion of prior decisions holding that exhaustion of state administrative remedies is not a prerequisite to an action under § 1983). *See also Pakdel v. City and County of San Francisco*, 594 U.S. ____ (2021) (per curiam).

196.    At all times relevant hereto, Defendant SAFEbuilt acted pursuant to a policy or custom of the Village in depriving property owners of personal property without court order and without providing an opportunity for the property owner to be heard.

197.    As described in detail above, Defendant SAFEbuilt unlawfully deprived Plaintiff of her property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

198.    The Village failed to adopt clear policies and failed to properly train, vet, or oversee its municipal contractor, SAFEbuilt, as to the proper role of the Village's zoning authority and the Village's building department with respect to building and zoning approvals and permits.

199.    The Village's policy or custom, its failure to adopt clear policies, and its failure to properly train, vet, or oversee its municipal contractors, were a direct and proximate cause of the constitutional deprivation suffered by Plaintiff.

200.    Defendants, at all times relevant to this action, were acting under color of state law.

201.    As a result of the Defendants' actions and policies and their failure to pay just compensation, Plaintiff has been injured and has suffered damages in an amount to be determined at trial.

**COUNT VII**
**LIABILITY OF THE VILLAGE OF DECATUR**
***MONELL* CLAIM, 42 U.S.C. § 1983**

202.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

203.    Upon information and belief, the Defendant, SAFEbuilt, Inc., is a private entity which has been retained to provide building inspection services, building permit services, and zoning approval services to the other Defendant, the Village of Decatur. **Exhibits E and O**.

204.    Municipal liability is present where a deprivation of a constitutional right results from policy, custom, or practice of a final policymaker. *Monell v Department of Social Services*, 436 US 658 (1978).

205.    Decisions issued by an official with final policymaking authority are municipal policy. *Pembaur v City of Cincinnati*, 475 US 469 (1986).

206.    The Defendants have maintained and implemented an unconstitutional policy, practice, and/or custom in denying property owners of their property without due process and in a manner wholly contrary to and inconsistent with the building and zoning approvals and permits previously issued by those parties.

207.    In depriving Plaintiff of the use and possession of her property, SAFEbuilt was acting as a final policymaker and SAFEbuilt's decisions were, upon information and belief, not subject to review or reversal by the Village.

208.    The aforementioned policies, practices, and customs were the moving forces of, and directly resulted in, the Defendants' unlawful deprivation of Plaintiff's property.

209.    Defendants knew or should have known that maintaining such policies, practices, and customs was in violation of well-established constitutional principles of due process.

210.    Furthermore, upon information and belief, the Village has failed, and continues to fail, in training, vetting, and/or supervising SAFEbuilt in a manner which prevents a pattern of unlawful property seizures from occurring and which ensures that SAFEbuilt is discharging its professional responsibilities on behalf of the Village in a competent and non-negligent manner.

211.    Plaintiff anticipates that the Village may assert that it is not subject to tort liability for actions taken by SAFEbuilt on behalf of the Village pursuant to the Governmental Immunity Act, MCL 691.1401 *et seq.*

212.    MCL 691.1407(2) provides, in essence, that an officer, employee, or member of a governmental entity is immune from tort liability for an injury to a person or damage to property caused by that person if that person is acting or reasonably believes he or she is acting within the scope of his or her authority, if the governmental agency is engaged in the exercise or discharge of a governmental function, and if the person's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. MCL 691.1407(2).

213.    Under Michigan law, gross negligence involves "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results". *Robinson v City of Detroit*, 462 Mich 439 (2000).

214.    The facts and circumstances of this case demonstrate that SAFEbuilt's employees failed to perform basic tasks during the course of their inspection of the Property, such as failing to notice that the Neighboring Building intruded over the Property Line and into the Property and failing to maintain accurate records regarding the portion of the Property which was demarcated for the pouring of the concrete foundation.

215.    Given the obvious and foreseeable risk of harm that such conduct posed to Plaintiff, who was entitled to act in reasonable reliance upon the representations, permits, and approvals issued by SAFEbuilt's employees, the aforementioned conduct of SAFEbuilt's employees amounts to gross negligence under Michigan law.

216.    Assuming, *arguendo*, that SAFEbuilt is correct in asserting that there exist deficiencies in the clearances between the Property and the Adjacent Property, the circumstances underlying those deficiencies should have been readily apparent to SAFEbuilt's employees during the course of their inspections of the Property.

217.    Given the obvious and foreseeable potential for harm arising from a failure to disclose the circumstances underlying those deficiencies, the conduct of SAFEbuilt's employees in issuing approvals and permits to Plaintiff notwithstanding those underlying circumstances also amounts to gross negligence under Michigan law.

218.    The Michigan Court of Appeals has held that municipalities who retain contractors to perform governmental functions can still be held liable for the negligent conduct of those contractors, particularly if the municipality has a vested interest in ensuring compliance with legal requirements. *See Brewster v City of Dearborn*, 333 Mich App 1 (2020); *see also McDonald v Village of New Haven*, 329 Mich App 87 (2019).

41

219.    The Michigan Court of Appeals has also held that a municipality can be liable for negligence if it retains significant supervisory control over an independent contractor performing work for the municipality or if the municipality has been negligent in its oversight of the contractor's actions. *See Saylor v City of Grand Rapids*, 205 Mich App 288 (1994).

220.    As a municipality subject to Michigan law, the Village has a vested interest in ensuring compliance with the legal requirements imposed by the Code.

221.    Upon information and belief, the Village Manager of the Village of Decatur retains supervisory control over the conduct of contractors retained by the Village, including the conduct of SAFEbuilt and its employees.

222.    Upon information and belief, the conduct of SAFEbuilt's employees in relation to the present case was aided, precipitated, or worsened by failures of supervision and control on the part of the Village in the hiring, vetting, and retention of competent municipal contractors.

223.    Given the instrumentality of the Village's failures of oversight and supervision in relation to the harms sustained by Plaintiff, the Village should be and is liable for the conduct of SAFEbuilt and its employees in the context of this case.

224.    As a result of the Defendants' actions and policies and their failure to pay just compensation, Plaintiff has been injured and has suffered damages in an amount to be determined at trial.

225.    Plaintiff is also entitled to damages, injunctive and declaratory relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Luann Sun, respectfully requests that this Court enter judgment in their favor and against the Defendants, and award the following relief:

A. That this Court enjoin SAFEbuilt, on the basis of equitable estoppel, from denying or attempting to deny that SAFEbuilt issued building and zoning approvals and permits in relation to the Project and that Plaintiff possessed such building and zoning approvals and permits.

B. That this Court enter a temporary restraining order and/or preliminary injunction against the Defendants, enjoining them from taking any action to condemn or threaten to condemn the Property pending a final resolution of this action.

C. That this Court enter an award against the Defendants and in favor of Plaintiff for damages sustained by Plaintiff as a result of the stop-work order issued by SAFEbuilt on November 11, 2025.

D. That this Court either issue a ruling holding that there are no deficiencies in the clearances between the Property and the Adjacent Property and excusing Plaintiff from complying with SAFEbuilt's demand for remediation with respect to the Project, or, in the alternative, that this Court issue a ruling holding that Plaintiff is not responsible or liable for any deficiencies in the clearances between the Property and the Adjacent Property and holding that SAFEbuilt and/or the Village are liable for any costs associated with the remediation of the Project to correct those deficiencies.

E. That this Court award Plaintiff costs, expenses, and reasonable attorneys' fees incurred in bringing this action; and

F. That this Court grant such other and further relief to Plaintiff as the Court deems just and proper.

Respectfully Submitted,

Dated:  December 22, 2025

/s/ *Anderson Grandstaff*

By:_____

Anderson Grandstaff (P81331)
Attorney for Plaintiff
238 N. Summit St, Unit 1
Ypsilanti, MI 48197
(231) 838-7917 (telephone)
Anderson.j.grandstaff@gmail.com